722 A.2d 615 (1999)
317 N.J. Super. 531
In re ADOPTION OF M.
Superior Court of New Jersey, Chancery Division, Family Part, Cape May County.
Decided October 15, 1998.
*616 April, Maudsley & Goloff, P.A., Marmora (James B. Arsenault, Jr., Atlantic City, on the brief) for petitioner.
Adoptive Father, pro se.
Adoptive Mother, pro se.
BATTEN, J.S.C.
Six and one-half years subsequent to entry of final judgment of adoption, the adoptive *617 daughter, now twenty-two years old, moves to vacate that judgment as to her recently-divorced adoptive parents. Vacation of that judgment would terminate the parent-child relationship between the adoptive daughter and her adoptive parents, thereby enabling the daughter to marry her adoptive father and legitimize the infant child conceived by them and born just two months prior to this application. Absent this relief, neither is competent to marry the other given the statutory proscription against marriage between "[a] woman" and "any of her ancestors or descendants". N.J.S.A. 37:1-I. Vacation of this judgment and marriage between these parties would render (1) adoptive father, as to adoptive daughter, a husband; (2) adoptive daughter, as to adoptive father, a wife; (3) adoptive father, as to newborn infant, natural father and former adoptive grandfather.[1] The undisputed facts are troubling beyond description. The legal consequences to approval of the application are far-reaching. Foreseeableseemingly unavoidable consequences to denial, however, would reach even further, adversely affectingindeed, stigmatizingthe life of that one person who neither created nor deserves these "very unusual facts and circumstances". Adoption of Children by O, 141 N.J.Super. 586, 359 A.2d 513, (Ch.Div.1976); Adoption of O, 88 N.J.Super. 30, 36, 210 A.2d 440 (Cty.Ct. 1965); Adoption of G, 89 N.J.Super. 276, 214 A.2d 549, (Cty.Ct.1965); In re T, 95 N.J.Super. 228, 230 A.2d 526, (App.Div.1967); Adoption of L, 56 N.J.Super. 46, 151 A.2d 435, (Cty.Ct.1959); Adoption of a Child of Indian Heritage, 111 N.J. 155, 543 A.2d 925, (1988). For reasons both factual and legal, this application to vacate the final judgment of adoption must be granted and, ultimately, for the sake of the new-born infant.
By complaint filed January 5, 1991, adoptive parents sought to adopt child M (hereinafter "petitioner"), born November 24, 1975, and voluntarily surrendered by her natural parents to the Division of Youth and Family Services, in May 1989. The adoption was uncontested. Final judgment of adoption entered January 25, 1991, consequent to the Division's written recommendation submitted to the court with "great pleasure". Petitioner was then fifteen years old. Two years and ten months later, on November 21, 1993, petitioner attained age eighteen N.J.S.A. 9:17B-3; Alford v. Somerset Co. Welfare Board, 158 N.J.Super. 302, 385 A.2d 1275 (1978); Straver v. Straver, 26 N.J.Misc. 218, 222, 59 A.2d 39 (Ch.1948).
At some point in time subsequent to the final judgment of adoption yet prior to September 8, 1997, the marital relationship between the adoptive parents failed. Adoptive mother, on this latter date, filed her complaint for divorce against adoptive father, alleging acts of extreme cruelty.[2]N.J.S.A. 2A:34-2. On November 18, 1997, final judgment of divorce dissolved the marriage of the adoptive parents. On July 29, 1998, petitioner, then twenty-two years of age, gave birth to an infant son. The parties acknowledge that adoptive father is the natural father of the infant.
Poignant realities emerge. First, petitioner and the adoptive father conceived the infant child in or about October 1997, at which time petitioner was twenty-one years of age.[3] Second, conception between petitioner *618 and adoptive father therefore likely occurred prior to the November 18, 1997, dissolution of his marriage to adoptive mother. Third, a fortiori, adoptive father engaged in a carnal relationship with his adult adoptive daughter while he was yet married to her adoptive mother. Fourth, the foregoing circumstances suggestand the record stipulated before the court specifically confirmsthat the relationship between petitioner and adoptive father had transgressed the parameters of a parent-child relationship well prior to the act of conception. Now the natural parents of the minor child, they desire to marry. Their present legal relationship as adoptive father and adoptive daughter, however, clearly renders the former an "ancestor" of, Whateley v. Leonia Board of Education, 141 N.J.Super. 476, 479, 358 A.2d 826 (Ch.Div.1976),[4] and the latter a "descendant" to, the other, In re Moses Estate, 58 N.J.Super. 67, 155 A.2d 273 (App.Div.1959)[5], thereby precluding lawful marriage between them[6]. N.J.S.A. 37:1-1. Hence, petitioner brings this application.
Petitioner's order to show cause was filed with the court and assigned a return date. She appeared for that preliminary hearing represented by counsel. Also appearing were her adoptive father and W. Robert Hentges, Surrogate of Cape May County.[7] Noting the failure of adoptive mother to appear, the court thereupon scheduled a plenary hearing and ordered petitioner's attorney to submit a trial memorandum and brief. Copies of this second management order were again served upon all interested partiesboth adoptive and natural parents as well as the Cape May County Surrogate.[8] Again, only petitioner and adoptive father appeared. The application being thus unopposed, the court considered testimony of petitioner and adoptive father, all of which consistently corresponded to their earlier filed certifications. To these facts, then, this court applies our law.
Final judgment of adoption marks a turning point in the status of the natural and adoptive parents. Entry of such a judgment terminates all relationships between the adopted child and his/her natural parents and all of the rights, duties, and obligations of any persons that are founded on such relationships, N.J.S.A. 9:3-50(a), including the inchoate right of a biological parent to develop and maintain such a relationship. See Sorentino v. Family & Children's Society of Elizabeth, 74 N.J. 313, 324, 378 A.2d 18 (1977). Subsequent to judgment, the adoptive parents are, as a matter of law, the *619 parents of that child as if the child had been born to the adoptive parents in lawful wedlock. N.J.S.A. 9:3-50(b); In re Adoption of Baby T, 311 N.J.Super. 408, 414, 709 A.2d 1381 (App.Div.1998); In re Adoption of Children by N.M., 96 N.J.Super. 415, 233 A.2d 188 (App.Div.1967); In re Child Adoption by I.T., 162 N.J.Super. 587, 394 A.2d 120 (Cty. Co.1978); In re Adoption of a Child by McKinley, 157 N.J.Super. 293, 384 A.2d 920 (Ch.Div.1978); In re Neuwirth's Estate, 155 N.J.Super. 410, 382 A.2d 972 (Cty.Co.1978).[9]
Under New Jersey law, any final judgment, including a judgment of adoption, may be challenged as long as such a motion is made within a reasonable period of time yet not more than one year after entry of judgment in cases of (a) mistake, inadvertence, surprise or excusable neglect, (b) newly discovered evidence and (c) fraud, misrepresentation or other misconduct of an adverse party. R. 4:50-1,-2. Such a motion is addressed to the sound discretion of the trial court, whose resolution of the motion will not be disturbed on appeal unless it results from a clear abuse of discretion. Hodgson v. Applegate, 31 N.J. 29, 37, 155 A.2d 97 (1959). The judgment of adoption, like any other judgment or order of this court, can be amended, modified, or vacated in the interest of justice. Indeed, "this court has jurisdiction to entertain a motion [to vacate final judgment of adoption] and is cognizant of its power to control, vacate, or correct its own judgments". In re Adoption of Baby T, 308 N.J.Super. 344, 349, 705 A.2d 1279 (Ch.Div.1997), rev'd on other grounds, 311 N.J.Super. 408, 709 A.2d 1381 (App.Div. 1998). While the court cannot ignore the Legislature's desire for finality in judgments of adoption, neither can the court ignore "the principle that relief in the form of vacation of a final judgment should be granted on the presentation of `truly exceptional circumstances' as determined by the particular facts of each case." In re Adoption of Baby T, supra (citing Baumann v. Marinaro, 95 N.J. 380, 395, 471 A.2d 395 (1984)).
The few New Jersey cases on point recognize our public policy that revocation or other modification of final judgment of adoption ought not occur absent very unusual facts and circumstances. In re Adoption of O, 88 N.J.Super. 30, 36, 210 A.2d 440 (Cty. Ct.1965). Any such application demands and deserves the most careful judicial scrutiny. The paramount consideration remains the best interests of the adoptive child. In re Adoption of G, 89 N.J.Super. 276, 281, 214 A.2d 549 (Cty.Ct.1965); In re Adoption of Child of Indian Heritage, 111 N.J. 155, 184, 543 A.2d 925. Importantly, not a single reported opinion, in this or any other state, has applied these basic principles to the most perplexing circumstances of this case: the adoptive child's attainment of majority, consequent emancipation, consensual impregnation by adoptive father, and birth of an infant child, all prior to the filing of the motion to vacate.[10] Other sources of authority for this application therefore warrant consideration.
Petitioner correctly cites R. 5:10-7(a), entitled "Petition for Modification or Revocation of an Order", as procedural authority for this application.[11] This rule specifically contemplates a petition for post-adoption relief *620 consistent with the more general provisions of R. 4:50-1. Prosecution of this application more than seven years subsequent to entry of final judgment of adoption, however, renders section (f) of R. 4:50-1 the only authority for this application and only then if "made within a reasonable time". R. 4:50-2. In pertinent part, R. 4:50-1(f) allows a court to "relieve a party or a party's legal representative from a final judgment or order ... (f) for any other reason justifying relief from the operation of the judgment or order". This omnibus provision contemplates "exceptional situations ... such exceptional cases [for which] its boundaries are as expansive as the need to achieve equity and justice". Housing Authority of Morristown v. Little, 135 N.J. 274, 286, 639 A.2d 286 (1994) (citing Court Investment Co. v. Perillo, 48 N.J. 334, 341, 225 A.2d 352 (1966).) Unlike R. 5:10-7, R. 4:50-1(f) has yielded trial court and appellate decisions, albeit relatively few, on applications to modify final judgments of adoption.
Most recently, Judge Cook, sitting in Chancery Division, Family Part, recognized the authority of the Family Part to entertain such a motion as well as its power to control, vacate or correct its own judgments. In re Adoption of Baby T, supra, at 349, 705 A.2d 1279; also see Wilford v. Sigmund Eisner Co., 13 N.J.Super. 27, 33, 80 A.2d 222 (App.Div.1951); In re T, 95 N.J.Super. 228, 235, 230 A.2d 526 (App.Div.1967); In re Adoption of Children by O, 141 N.J.Super. 586, 589, 359 A.2d 513 (Ch.Div.1976); In re Adoption of G, 89 N.J.Super. 276, 280, 214 A.2d 549 (Cty.Ct.1965). A final judgment of adoption "should not be set aside unless it is in the best interest of the child and adoptive parents", In re Adoption of Baby T., supra, at 355, 705 A.2d 1279, and upon the showing of "truly exceptional circumstances" as determined by the particular facts of each case. Id. at 350, 705 A.2d 1279; Baumann v. Marinaro, 95 N.J. 380, 471 A.2d 395 (1984). Adjudication of such a motion must include consideration of not only the adoption statutes, cases and other written authority, but also the inherent equitable authority of a court of chancery. Family courts, being courts of equity:
have reflected the collective public conscience of what should and should not be done. Equity involves the obedience to dictates of morality and conscience. The morality of which equity speaks is that of society and not the judge's personal view of right and wrong. Likewise, equity may not disregard statutory law but looks to its intent rather than its form. In re Quinlan, 137 N.J.Super. 227[, 348 A.2d 801] (Ch.Div.1975), mod., remanded other grounds 70 N.J. 10[, 355 A.2d 647], (1976).
[Sheridan v. Sheridan, 247 N.J.Super. 552, 558-59, 589 A.2d 1067 (Ch.1990).]
Through its equity or chancery jurisdiction, the Family Part possesses the sovereign power of parens patriae through which the best interests of children must be advanced, protected and preserved. Id. at 354, 705 A.2d 1279; Matter of Adoption of a Child by McKinley, 157 N.J.Super. 293, 384 A.2d 920, (Ch.Div.1978); In re Adoption of G, 89 N.J.Super. 276, 281, 214 A.2d 549 (Cty.Ct.1965); Hon. Robert Page, Family Courts: An Effective Judicial Approach to the Resolution of Family Disputes, 44 Juv. & Fam. Ct. Journal 9-10 (1933). In addition, the desirability of a legal basis for judicial action should not inhibit or unduly restrict a family court in the application of equitable principles. Hon. Robert Page, Family Law Practice, 2-2 (1991). Indeed, the Legislature has mandated that the Adoption Act of New Jersey "shall be liberally construed to the end that the best interests of children be promoted," and "due regard shall be given to the rights of all persons affected by an adoption." N.J.S.A. 9:3-37. [Emphasis added].
These statutory phrases, "best interests of children" and "due regard ... given to the rights of all persons affected by an adoption", suggest recognition by our Legislature that a proceeding for adoption may well affect the best interests of a child or children other than the adoptive child. Likewise, an adoption may well affect the rights of persons other than the adoptive child and the parents, both natural and adoptive. [Emphasis added]. In this regard, the Adoption Act recognizes implicitly the breadth of consequences to final judgments entered thereunder, including, as here the case, consequences *621 to the passage of time. And through the passage of time, circumstances likely change, and the continuing effect of a final judgment of adoption may affect differentlyeven adverselythe rights of "all persons" originally affected, including children other than the adoptive child or, as here, an infant child born years later to the adoptive childnow an emancipated adultand her adoptive father.
Certainly, the interests of "all persons affected" by this adoption have changed measurably. First, the adoptive child, in whose best interests the adoption occurred, is now, seven years later, (A) twenty-two years of age, (B) a natural mother of a two month old infant son, and (C) intent upon marriage to her son's natural father. The absence of any facts of record which might support a finding of abuse, neglect, domestic violence or other unlawful act suggests a petitioner's conscious decision that her legal relationship with her adoptive father had achieved its purpose and, parent-child status notwithstanding, the complexities and realities of human emotions and relationships warrant transposition of that status from father-daughter co-parents to husband and wife.[12] Through marriage, petitioner legitimizes not only her relationship with her son's father but the status of her infant son as well. The former presumably brings greater social legitimacy to the parents of the newborn. The latter achieves that same legitimacy of heritage for the child yet foreseeably spares the child a lifetime of undeserved, immeasurable and endless stigma as a child born to a mother whose father is also his own. Such a circumstance is both tragic and avoidable.
The interests of adoptive parents are relevant considerations. In re Adoption of Children by O., 141 N.J.Super. 586, 589, 359 A.2d 513 (Ch.Div.1976); In re Adoption of G., supra. Certainly, the interests and motives of a third party seeking to affect the judgment of adoption should be viewed more strictly than the interests and motives of a party to that adoptive judgment.[13] Still, adoption judgments are so insulated against voidance that, as stated in In re Adoption of O, 88 N.J.Super. 30, 36, 210 A.2d 440 (Cty.Ct.1965) and again in In re Adoption of Children by O, supra, 141 N.J.Super. at 589, 359 A.2d 513: "public policy dictates that there be very unusual facts and circumstances which would compel a court to set aside or revoke a judgment for adoption." Thus, for example, in In re Adoption of G., the court denied a motion by adoptive parents to vacate the adoption of a child who, post-judgment, required institutional care due to undisclosed mental retardation. The adoptive parents asserted that the financial burden and time necessary to care for the retarded infant would have an adverse effect on their other children. Dismissing that argument, the court held that only the interests of the adoptive child and adoptive parents should be considered. In re Adoption of G., supra, 89 N.J.Super. at 279, 281, 214 A.2d 549. The unusual facts and circumstances of In re Adoption of Children by O., supra, by contrast, yielded a contrary result. There, the adoption of three children was vacated because, soon after the adoption judgment entered, the mother deserted the adoptive father and took the children with her. The children neither saw nor did they know their adoptive father. They never used his name. The adoptive father secured a divorce on the grounds of desertion. Seeking to sever all ties between adoptive father and the children, both adoptive parents sought to vacate the judgment of adoption but as to adoptive father only. The court granted the application, concluding that such relief advanced the best interests of the children, given (1) the lack of any father-child relationship, (2) the children's use of the surname of their adoptive mother, (3) consent of both adoptive mother and adoptive father, and, revealingly, (4) the certain benefit which would inure to the children through avoidance of the emotional trauma predictably consequent to the *622 continuation of a legal fiction, i.e. parent-child relationship lacking psychological or any other basis in fact. 141 N.J.Super. at 590, 359 A.2d 513.
Clearly, the facts here fail to approach even remotely the facts confronting our courts in prior reported opinions and, as such, constitute "truly exceptional circumstances" for several reasons. In re Adoption of Baby T., 308 N.J.Super. 344, 350, 705 A.2d 1279 (Ch.Div.1997), rev'd. on other grounds 311 N.J.Super. 408, 709 A.2d 1381 (App.Div. 1998), citing Baumann v. Marinaro, supra at 395, 471 A.2d 395. First, all reported cases contemplate an application to vacate a final judgment of adoption at a time during the minority of the adoptive child; here, the petitioner, as adopted child, moves post-emancipation to vacate the judgment of adoption. In this sense, the "best interests" standard of N.J.S.A. 9:2-4 no longer pertains to the adoptive child. Second, the stated purpose of the petition to vacate is eradication of a legal impediment to petitioner's marriage to her adoptive father, a relationship to which petitioner and adoptive father would be entitled absent their present legal status as father-daughter. Third, vacation of the final judgment of adoption would also shed adoptive father of his simultaneous status as natural father and legal grandfather of the minor infant, leaving him the natural father only. Fourth, vacation of the adoption judgment, through its cure of the statutory impediment to marriage, would further legitimize the infant, thereby advancing long-standing policy of this state to protect the status of children. More "truly exceptional circumstances" are difficult to imagine.
There can be no doubt that all of the foregoing consequences to vacation of the final judgment of adoption will substantially advance the best interests of the young infant in contrast to the best interests of the adult mother in whose interest the judgment initially entered. Eradication of adopted father's contemporaneous status as natural father and adoptive grandfather of the new-born child, competency of the petitioner and adoptive father to marry, legitimization of the infant as a result of the marriage of his natural parents, and, arguably of greater and more lasting benefit to the child, avoidance of life-long stigma that would predictably accompany petitioner's unique heritage, are all certain consequences to vacation of that judgment.[14] While these advantages to petitioner and adoptive father warrant consideration of the application to vacate, the predictable benefits to the infant are the most readily embraced reasons for approval of the application. While neither petitioner nor any party to this action has invoked the best interests of the minor child in support of the application, this court deems the heritage and reputation of the infant childwho neither asked for nor caused any of these circumstances now sought to be curedthe paramount considerations. N.J.S.A. 9:2-4. This benefit to the infant child emerges unmistakably as the most "truly exceptional circumstance" which is now achieved only through vacation of the judgment of adoption.
In so finding, the court notes parenthetically that petitioner is not seeking to regain any legal or equitable right to inherit from her natural parents; nor is she seeking to permit her natural parents to take from her under the laws of intestacy. Similarly, petitioner is not seeking to reestablish any relationship, legal or otherwise, with her natural parents.[15]
The conclusion that the "truly exceptional circumstances" found within this record warrantindeed compelvacation of final judgment of adoption invites one further comment. Specifically, denial of this application *623 would yet leave unto petitioner her right to move before this court for termination of her adoptive relationship with adoptive father in favor of her adoption by another adult, pursuant to N.J.S.A. 2A:22-1 to -3.[16] There, either an unmarried person of full age or a married person with his or her spouse's consent would be entitled, as a matter of contract with petitioner, to adopt her, thereby terminating the parent-child relationship with her adoptive father, subject only to a finding by the court that (1) the adopting parent is of good moral character and reputable standing in the community and (2) the adoption would inure to the benefit of the person being adopted, i.e. petitioner. For the reasons articulated hereinabove, the benefits inuring to petitioner consequent to termination of her relationship with her adoptive father are readily apparent. Presumably, the moral character and reputable standing of a new adoptive parent would be easily established. As such, the court's decision to vacate the final judgment of adoption affords petitioner relief no less available to her had she proceeded under the Adult Adoption statute. N.J.S.A. 2A:22-1; Adoption of an Adult by V.A., 294 N.J.Super. 400, 683 A.2d 591 (Ch.1996); In re Adoption of an Adult by C.K., 314 N.J.Super. 605, 715 A.2d 1030 (Ch.Div.1998); In re Adoption of P., 193 N.J.Super. 33, 471 A.2d 1220 (Law 1983); In re Holibaugh's Will, 33 N.J.Super. 232, 109 A.2d 706 (Cty. Co.1955) aff'd 18 N.J. 229, 113 A.2d 654; In re Adoption of A., 118 N.J.Super. 180, 286 A.2d 751 (Cty.Co.1972); in re Nicol's Estate, 152 N.J.Super. 308, 377 A.2d 1201 (App.Div.1977); In re Griswold's Estate, 140 N.J.Super. 35, 354 A.2d 717 (Cty.Co.1976); In re Comley's Estate, 90 N.J.Super. 498, 218 A.2d 175 (Cty.Co.1966).
Petitioner's application to vacate the final judgment of adoption as pertains to her adoptive father isas it must begranted. That judgment, as pertains to her adoptive mother, remains in full force and effect. Such are the requests of petitioner and each of her adoptive parents. Any other decision would leave this familyparticularly its newest and most innocent membercontinuously and forever enmeshedif not entrappedin a confusing mire of conflicting relationships, both natural and adoptive, both former and current, some simultaneous, all of which would challenge even the most skilled genealogist. Of this, the newborn infant deserves better. From this, the newborn infant is, to the extent now possible, spared.
NOTES
[1] The application initially sought to vacate the judgment of adoption as relates to both adoptive father and adoptive mother. The failure of adoptive mother to respond or otherwise appear to any extent or degree, valid service notwithstanding, coupled with adoptive daughter's failure to appear at the plenary hearing on this petition as relates to adoptive mother, leaves the court no choice but to deny the petition as to adoptive mother. Subsequent ex parte correspondence from adoptive mother to this court, received into this record, confirmed the mutual decision of adoptive daughter and adoptive mother to leave their relationship undisturbed. The petition thus submitted seeks to vacate final judgment of adoption as to adoptive father only. If granted, adoptive father will become, upon marriage to petitioner, the son-in-law of his former wife.
[2] Petitioner's certification suggests that the adoptive parents actually separated several years prior to the filing of the divorce complaint.
[3] The July 1998 birth of petitioner's infant son presumably occurred approximately nine (9) months subsequent to conception. Matter of Baby M, 217 N.J.Super. 313, 525 A.2d 1128, cert. granted 107 N.J. 140, 526 A.2d 203, aff'd in part, reversed in part, 109 N.J. 396, 537 A.2d 1227 on remand 225 N.J.Super. 267, 542 A.2d 52 (1988); Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).
[4] In Whateley, the trial court dismissed plaintiff's application to declare unconstitutional a school board's stated policy against employment of a "second member of an immediate family" on grounds that the proscription violated the N.J. Constitution, Art. I, par. 5, and the then-effective law against discrimination, N.J.S.A. 10:5-4. In so doing, the court interpreted "ancestry" to reference "genealogical succession" or "line of descent", citing Black's Law Dictionary (4th ed.1951), i.e. "one from whom a person lineally descended or may be descended; a progenitor". 141 N.J.Super. at 477-79, 358 A.2d 826.
[5] In Moses' Estate, the Appellate Division observed that:

"the term `issue' is generally held to be synonymous with the term `descendants'. Sanford v. Kaercher, 126 N.J.Eq. 391[, 9 A.2d 50] (Ch. 1939); In re Fisler, 133 N.J.Eq. 421[, 30 A.2d 894] (E. & A.1942); Walsh v. Hulse, 23 N.J.Super. 573, 93 A.2d 230 (Ch.Div.1952)." 58 N.J.Super. at 73, 155 A.2d 273.
[6] N.J.S.A. 37:1-1 states, in pertinent part, that:

A man shall not marry any of his ancestors or descendants, or his sister, or the daughter of his brother or sister, or the sister of his father or mother, whether such collateral kindred be of the whole or half blood. A woman shall not marry any of her ancestors or descendants, or her brother, or the son of her brother or sister, or the brother of her father or mother, whether such collateral kindred be of the whole or half blood. A marriage in violation of any of the foregoing provisions shall be absolutely void. [Emphasis added].
[7] Notice of the return date and a copy of the order to show cause with supporting certifications were served upon the adoptive mother per order of the court. Petitioner, apparently aware of the names and last known addresses of each of her natural parents, notified the natural parents as well. Only adoptive father appeared on the return date, valid service notwithstanding. R. 1:5-2, 3 and 4.
[8] This record is silent as to the means by which petitioner obtained any information about her natural parents; the adoption record remains sealed. Her age at time of adoption, i.e. fifteen, suggests the possibility of personal recollection of this information.
[9] The Supreme Court of the United States has observed that "[p]arental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring"; Lehr v. Robertson, 463 U.S. 248, 260, 103 S.Ct. 2985, 2992, 77 L.Ed.2d 614, 626 (1983), quoting Caban v. Mohammed, 441 U.S. at 397, 99 S.Ct. at 1770, 60 L.Ed.2d at 310 (Stewart, J. dissenting) (emphasis added in Lehr deleted).
[10] The court's research revealed one hundred fifty-five reported opinions, nationwide, on the issue of applications to vacate final judgments of adoption. The facts in this case are unique.
[11] R. 5:10-7 states:

A petition by any or by the next friend appointed by the court, or by any other person or persons interested in the welfare of the child, for an order modifying or revoking any order entered in a proceeding for the adoption of a child, shall be verified and shall be served on each plaintiff and upon the next friend, if one shall have been appointed, unless such party shall have joined in such petition.
This rule, adopted December 20, 199 and effective December 31, 1983, restates the source rule, former R. 4:94-6, adopted as part of the 1969 revision. Prior thereto, court rules were silent on petitions to modify or revoke "any order entered in a proceeding for the adoption of a child". Id.
[12] As above cited, neither petitioner nor adoptive father are competent to marry the other absent vacation of the father-daughter relationship. N.J.S.A. 37:1-1. Footnote 5, infra.
[13] As a general rule, "[t]he new relationship between the adoptive parents and the child is so fixed that there may be no interference from any outside source." In re Adoption of G., supra, 89 N.J.Super. at 281, 214 A.2d 549. [Emphasis added].
[14] Of these considerations, the stated desire of petitioner and adoptive father to marry is the least persuasive to this court. While marriage remains an institution yet encouraged by the public policies of this state, N.J.S.A. 37:1-1 to 1-12, the uncertainties of human emotion, generally, and the recent volatility of familial relationships between these parties, specifically, suggest that the prospect of petitioner ultimately marrying adoptive father is less than absolute or even likely. The other stated benefits to vacation of the adoption judgment, however, substantially compeleach of them and all of themvacation of that judgment.
[15] Petitioner does not seek, for example, the right to resume her birth name. N.J.S.A. 2A:52-1 to -4.
[16] N.J.S.A. 2A:22-1 states, in pertinent part, that:

The Superior Court shall allow an unmarried person of full age, a husband with his wife's consent, a wife with her husband's consent or a husband and wife jointly to adopt an adult person and may change the name of the adult, if the court is satisfied that the adopting parent or parents are of good moral character and of reputable standing in their community, and that the adoption will be to the advantage and benefit of the person to be adopted.